**Electronically Filed
Supreme Court
SCOT-19-0000830
15-MAR-2023
08:04 AM
Dkt. 131 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

IN THE MATTER OF THE PETITION OF KU'ULEI HIGASHI KANAHELE AND
AHIENA KANAHELE, INDIVIDUALS, FOR A DECLARATORY ORDER CONCERNING
THE INVALID CLASSIFICATION OF THE DE FACTO AND IMPROPER
INDUSTRIAL USE PRECINCT ON APPROXIMATELY 525 ACRES OF STATE LAND
USE CONSERVATION DISTRICT LANDS LOCATED IN MAUNA KEA AND HILO,
COUNTY OF HAWAI'I, TAX MAP KEY NO.: 4-4-015:0090 (POR.)

_____

SCOT-19-0000830

APPEAL FROM THE LAND USE COMMISSION
(DOCKET NO. DR-19-67 (Agency Appeal))

MARCH 15, 2023

RECKTENWALD, C.J., NAKAYAMA, J.,
CIRCUIT JUDGE CATALDO, ASSIGNED BY REASON OF VACANCY,
AND WILSON, J., DISSENTING, WITH WHOM McKENNA, J., JOINS

OPINION OF THE COURT BY NAKAYAMA, J.

This is another case in the series of proceedings

challenging the construction of the Thirty Meter Telescope

(TMT).  However, unlike prior proceedings that only sought to

prevent the TMT from being built, Appellants Ku'ulei Higashi Kanahele and Ahiena Kanahele (collectively, the Kanaheles) seek to use the Land Use Commission's (the Commission or LUC) districting authority in a way that could compel the removal of all astronomy facilities located within the Astronomy Precinct by petitioning the Commission for declaratory relief.

On November 29, 2019, the Commission issued a written Order Denying Petition for Declaratory Order (LUC Order).  The Commission explained that it lacked jurisdiction (1) to use the declaratory ruling procedure to undermine decisions already made, and (2) to regulate land uses in the Astronomy Precinct because the legislature granted such authority to the Department of Land and Natural Resources (the Department or DLNR).

The following day, the Kanaheles appealed to this court.  The Kanaheles seek to use the Commission's declaratory ruling authority (1) to challenge past decisions that astronomy facilities are permissible within conservation districts and (2) to contravene the Department's power to regulate conservation district uses.  Contrary to the Kanaheles' claim that the Commission may restrict land uses through Hawai'i Revised Statutes (HRS) § 205-2(e),[1] the statute merely identifies

---

[1]    HRS § 205-2 (2017) provides in relevant part:

> (a) There shall be four major land use districts in
> which all lands in the State shall be placed: urban, rural,

2

agricultural, and conservation. The land use commission shall group contiguous land areas suitable for inclusion in one of these four major districts. The commission shall set standards for determining the boundaries of each district, provided that:

(1) In the establishment of boundaries of urban districts those lands that are now in urban use and a sufficient reserve area for foreseeable urban growth shall be included;

(2) In the establishment of boundaries for rural districts, areas of land composed primarily of small farms mixed with very low density residential lots, which may be shown by a minimum density of not more than one house per one-half acre and a minimum lot size of not less than one-half acre shall be included, except as herein provided;

(3) In the establishment of the boundaries of agricultural districts the greatest possible protection shall be given to those lands with a high capacity for intensive cultivation; and

(4) In the establishment of the boundaries of conservation districts, the "forest and water reserve zones" provided in Act 234, section 2, Session Laws of Hawaii 1957, are renamed "conservation districts" and, effective as of July 11, 1961, the boundaries of the forest and water reserve zones theretofore established pursuant to Act 234, section 2, Session Laws of Hawaii 1957, shall constitute the boundaries of the conservation districts; provided that thereafter the power to determine the boundaries of the conservation districts shall be in the commission.

In establishing the boundaries of the districts in each county, the commission shall give consideration to the master plan or general plan of the county.

(b) Urban districts shall include activities or uses as provided by ordinances or regulations of the county within which the urban district is situated.

In addition, urban districts shall include geothermal resources exploration and geothermal resources development, as defined under section 182-1, as permissible uses.

. . . .

(e) Conservation districts shall include areas necessary for protecting watersheds and water sources; preserving scenic and historic areas; providing park lands, wilderness, and beach reserves; conserving indigenous or

3

uses that are permitted within conservation districts.  The statute does not authorize the Commission to exclude or enforce certain land uses within conservation districts.

## I.    BACKGROUND

### A.    The Mauna Kea Observatories

In January 1964, Gerard Kuiper began investigating Mauna Kea as a possible observatory site.  David Leverington, A History of Astronomy: From 1890 to the Present 276 (2012).  That same year, the University of Hawaiʻi (UH) and the University of Arizona entered into an agreement to build a test telescope and dome on Mauna Kea.  Id.  An access road was built in May 1964, and the Mauna Kea Observatory was dedicated on July 20, 1964. Id.  By 1970, UH completed a second telescope on Mauna Kea.  Id. By 2008, thirteen telescopes had been constructed in the Astronomy Precinct.  Mauna Kea Comprehensive Management Plan 93-94 (Apr. 2009).

endemic plants, fish, and wildlife, including those which are threatened or endangered; preventing floods and soil erosion; forestry; open space areas whose existing openness, natural condition, or present state of use, if retained, would enhance the present or potential value of abutting or surrounding communities, or would maintain or enhance the conservation of natural or scenic resources; areas of value for recreational purposes; other related activities; and other permitted uses not detrimental to a multiple use conservation concept.  Conservation districts shall also include areas for geothermal resources exploration and geothermal resources development, as defined under section 182-1.

4

B.    Hawai'i Land Use Laws

Hawai'i's land use laws developed almost in parallel to the growth in astronomy on Mauna Kea.  In 1961, the State adopted a statewide land use law.  1961 Haw. Sess. Laws Act 187, at 299-305.  As a part of this law, the legislature established the Commission with significant powers.  1961 Haw. Sess. Laws Act 187, § 2 at 300.  The legislature authorized the Commission to "group contiguous land areas suitable for one of . . . three major uses into a district and designate it as an urban district, agricultural district or conservation district, as the case may be."  1961 Haw. Sess. Laws Act 187, § 3 at 300.

Notably, the legislature mandated that "the boundaries of the forest and water reserve zones theretofore established pursuant to Act 234, SLH 1957, shall constitute the [initial] boundaries of the conservation districts, provided, that thereafter the power to determine the boundaries of the conservation districts shall be in the commission."  1961 Haw. Sess. Laws Act 187, § 3 at 300.  Moreover, the legislature granted the Commission power to amend district boundaries, and even required the Commission to review district boundaries every five years.  1961 Haw. Sess. Laws Act 187, §§ 6, 12 at 301-03.

However, the legislature declined to provide the Commission with powers to regulate land uses within the

5

conservation districts. 1961 Haw. Sess. Laws Act 187, § 3 at 300 ("Zoning powers within conservation districts shall be exercised by the [board of commissioners of agriculture and forestry] to which is assigned the responsibility of administering the provisions of Act 234, SLH 1957."); see also 1957 Haw. Sess. Laws Act 234, § 2 at 254-56.

In 1963, the legislature recognized a "demonstrated . . . need for clarifying the provisions of . . . Act 187 . . . with reference to the division of authority between the land use commission and the counties," and therefore amended the land use laws. 1963 Haw. Sess. Laws Act 205, § 1 at 315. As a part of this effort, the legislature created a fourth district category — rural — and articulated:

> Conservation districts shall include areas necessary for protecting watersheds and water sources; preserving scenic areas: [sic] providing park lands, wilderness and beach reserves; conserving endemic plants, fish, and wildlife; preventing floods and soil erosion; forestry; and other related activities; and other permitted uses not detrimental to a multiple use conservation concept.

1963 Haw. Sess. Laws Act 205, § 2 at 316-17. The legislature also transferred governing authority over the conservation districts to the Department. 1963 Haw. Sess. Laws Act 205, § 2 at 318. The legislature further provided that "[t]he appropriate . . . agency charged with the administration of . . . zoning laws shall enforce . . . the use classification districts adopted by the commission and shall report to the

commission all violations thereof."  1963 Haw. Sess. Laws Act 205, § 2 at 320.  However, the legislature retained the requirement that the Commission review district classifications every five years.  1963 Haw. Sess. Laws Act 205, § 2 at 320.

In 1975, the legislature repealed its mandate that the Commission regularly review the district boundaries, but expressly provided that the Commission still had authority to petition itself to redistrict district boundaries.  1975 Haw. Sess. Laws Act 193, §§ 5-6 at 443 ("Any department or agency of the State including the land use commission . . . may petition the land use commission for a change in the boundary of a district.") (emphasis added), 445 (repealing the mandatory five-year review).

In 1985, the legislature re-enacted the mandatory five-year district boundary review requirement, but transferred the authority to periodically review and initiate district boundary amendment proceedings to the Department of Planning and Economic Development.  1985 Haw. Sess. Laws Act 230, § 2 at 417.[2] The legislature subsequently transferred the authority to the

---

[2]    At the same time, the legislature amended HRS § 205-4 to delete the phrase "including the land use commission" from its articulation that "[a]ny department or agency of the State . . . may petition the land use commission for a change in the boundary of a district."  1985 Haw. Sess. Laws Act 230, § 4 at 418.  Thus, it appears that the legislature intended to strip the Commission of its authority to amend district boundaries sua sponte.

Office of State Planning in 1988.  1988 Haw. Sess. Laws Act 352, § 3 at 679.  The Office of State Planning – now the Office of Planning and Sustainable Development (the Planning Office) – retains the authority to review the districts to this day.  See HRS § 205-18 (Supp. 2021).[3]

C.   **Astronomy Precinct Districting**

The Commission issued its first state land use district boundary maps in 1964.  See Land Use Comm'n, SLU District Boundary Maps, https://luc.hawaii.gov/maps/land-use-district-boundary-maps/.  The Commission issued its second state land use district boundary maps in 1974.  Id.  The Commission did not change the Astronomy Precinct from a conservation district in either of these processes.

The Planning Office subsequently completed a state land use district boundary review in 1992.  See Off. of State Planning, State Land Use District Boundary Review Hawaii (1992), http://files.hawaii.gov/dbedt/op/lud/20210500%20Boundary%20Revie w/1992HawaiiStateLandUseDistrictBoundaryReview.pdf (1992 Boundary Review).  The Planning Office recognized that "[t]he University of Hawaii's Master Plan for the Mauna Kea Science

---

[3]     In 2021, the legislature amended HRS § 205-18 to authorize, rather than require, the Planning Office to conduct district boundary reviews. Currently, HRS § 205-18 reads: "The office of planning and sustainable development may undertake a review of the classification and districting of all lands in the State."  HRS § 205-18 (Supp. 2021) (emphasis added).

Reserve calls for 13 telescopes by the year 2000." Id. at 23.
However, the Planning Office did not call for the Astronomy
Precinct to be redistricted from a conservation district to an
urban district.[4] Id. at 121-27.

## D. Prior Proceedings Related to the TMT

Planning for the TMT began prior to 2010. Matter of
Conservation Dist. Use Application HA 3568, 143 Hawaiʻi 379, 386,
431 P.3d 752, 759 (2018) (Mauna Kea II); see also Mauna Kea
Anaina Hou v. Bd. of Land and Nat. Res., 136 Hawaiʻi 376, 381,
363 P.3d 224, 229 (2015) (Mauna Kea I). On September 2, 2010,
UH submitted a Conservation District Use Application to the
Department. Mauna Kea II, 143 Hawaiʻi at 387, 431 P.3d at 760.
In 2013, the Department granted a conservation district use
permit (2013 CDUP) before holding a contested case hearing. Id.
This court vacated the 2013 CDUP and remanded for the Department
to hold a contested case hearing. Id.; see also Mauna Kea I,
136 Hawaiʻi at 399, 363 P.3d at 247.

Between October 2016 and March 2017, a Department-
appointed hearing officer conducted a contested case hearing

---

[4] Most recently, the Planning Office completed another state land use district boundary review on January 28, 2022. Off. of Planning and Sustainable Development, State Land Use Review of Districts (Jan. 28, 2022), http://files.hawaii.gov/dbedt/op/lud/20220128%20State%20Boundary%20Review-Final/SLUReviewofDistricts1-28-22Final3.pdf (2022 Boundary Review). The Planning Office did not recommend that the Astronomy Precinct be redistricted from a conservation district to an urban district. Id. at 125-38, 35.

over forty-four days.  Mauna Kea II, 143 Hawaiʻi at 387, 431 P.3d at 760.  Kuʻulei Kanahele was among the witnesses who testified in opposition to the Department issuing a conservation district use permit (CDUP) for the TMT.

On September 27, 2017, the Department issued its decision and order (DLNR Decision) authorizing the issuance of a conservation district use permit for the construction of the TMT.  Mauna Kea II, 143 Hawaiʻi at 384, 387, 431 P.3d at 757, 760.  The DLNR Decision was appealed to this court.  Id.

On October 30, 2018, this court affirmed the DLNR Decision.  Mauna Kea II, 143 Hawaiʻi at 409, 431 P.3d at 782.

**E.   The Kanaheles' Petition**

On September 3, 2019, the Kanaheles filed the underlying petition with the Commission.  In the petition, the Kanaheles asked the Commission to "issue declaratory orders stating:"

> (1) current industrial research facility uses in the [Astronomy Precinct[5]] are appropriate within the urban district as prescribed by HRS § 205-2(b) and not the conservation district;
>
> (2) further industrial uses proposed for the [Astronomy Precinct] must comply with HRS chapter 205 and Commission procedures for obtaining a district boundary amendment to reclassify conservation lands into the urban district; and,

---

[5]    The Kanaheles refer to the 525-acre area in which the Mauna Kea observatories are located as a "de facto industrial precinct."  Because this court has identified the area as an "Astronomy Precinct" in prior decisions, this opinion continues to use that terminology.  See Mauna Kea II, 143 Hawaiʻi at 385, 431 P.3d at 758; Mauna Kea I, 136 Hawaiʻi at 381, 363 P.3d at 229.

10

(3) even if a single scientific laboratory or other research facility may be appropriate within non-urban districts, the successive, individual approval of thirteen scientific laboratories, other research facilities, and associated offices, parking lots, and utilities, within the [Astronomy Precinct] constitutes urban uses inconsistent with conservation district uses and/or detrimental to a multiple use conservation concept for which a district boundary amendment must be obtained.

On October 24 and 25, 2019, the Commission held a hearing on the Kanaheles' petition. The Commission heard testimony from twenty-three witnesses; a representative of West Maui Preservation Association and Na Papaʻi Wawae ʻUlaʻula; and the Kanaheles; and heard a statement from the Kanaheles' attorney.

The Kanaheles acknowledged that part of the purpose of their petition was to oppose the construction of the TMT. The Kanaheles also indicated that they were not asking the Commission to reclassify the Astronomy Precinct from a conservation district to an urban district, but rather to give the Kanaheles "the opportunity to say we don't want rezoning" that already occurred through the construction of the astronomy facilities.

The Kanaheles' attorney argued that the Commission's authority to issue the requested declarations arose from HRS § 205-2(e). Specifically, the Kanaheles' attorney reasoned that the Commission could use its "exclusive authority to determine the districts" and noted that the astronomy facilities "don't

11

fit any -- industrial structures don't fit any of the descriptions of conservation lands, including permitted uses that are not detrimental to a multiple use conservation concept."  Thus, the Kanaheles' attorney explained that the Kanaheles were

> asking [the Commission] just to interpret 205 and say the concentration of industrial research facilities on Mauna Kea are appropriate uses or are appropriate within the urban district or in an urban district as prescribed by 205-2 and not the conservation district.  Further industrial uses must comply with boundary amendment procedures to reclassify those lands into the urban district.

The Kanaheles' attorney noted that the Kanaheles' petition was "not seeking enforcement of anything except for [HRS chapter] 205."

When asked about the practical result of the Kanaheles' petition, the Kanaheles' attorney acknowledged that "in order to keep things as they are," "the legal effect of [the Kanaheles'] petition is to . . . force the State of Hawaiʻi or whoever might be considered the landowner of the land on which the telescopes sit to have to file a request for a [district] boundary amendment."  In the event the district boundary amendment request is denied, the astronomy facilities "would either have to come down, or they would reapply and try to find another way to mitigate it better."

The Commission voted to deny the Kanaheles' petition five to two.

12

On November 29, 2019, the Commission issued its written LUC Order. As relevant here, the Commission cited to Citizens Against Reckless Development v. Zoning Board of Appeals of Honolulu, 114 Hawaiʻi 184, 196-97, 159 P.3d 143, 155-56 (2007) (CARD) and determined "that the declaratory ruling procedure could not be invoked by the Petitioner's [sic] in this matter." The Commission recognized that the Department has authority to govern conservation districts under HRS § 205-5(a).[6] The

---

[6] HRS § 205-5 (2017) provides:

(a) Except as herein provided, the powers granted to counties under section 46-4 shall govern the zoning within the districts, other than in conservation districts. Conservation districts shall be governed by the department of land and natural resources pursuant to chapter 183C.

(b) Within agricultural districts, uses compatible to the activities described in section 205-2 as determined by the commission shall be permitted; provided that accessory agricultural uses and services described in sections 205-2 and 205-4.5 may be further defined by each county by zoning ordinance. Each county shall adopt ordinances setting forth procedures and requirements, including provisions for enforcement, penalties, and administrative oversight, for the review and permitting of agricultural tourism uses and activities as an accessory use on a working farm, or farming operation as defined in section 165-2. Ordinances shall include but not be limited to:

(1) Requirements for access to a farm, including road width, road surface, and parking;

(2) Requirements and restrictions for accessory facilities connected with the farming operation, including gift shops and restaurants;

(3) Activities that may be offered by the farming operation for visitors;

(4) Days and hours of operation; and

(5) Automatic termination of the accessory use upon the cessation of the farming operation.

13

Each county may require an environmental assessment under chapter 343 as a condition to any agricultural tourism use and activity.  Other uses may be allowed by special permits issued pursuant to this chapter.  The minimum lot size in agricultural districts shall be determined by each county by zoning ordinance, subdivision ordinance, or other lawful means; provided that the minimum lot size for any agricultural use shall not be less than one acre, except as provided herein.  If the county finds that unreasonable economic hardship to the owner or lessee of land cannot otherwise be prevented or where land utilization is improved, the county may allow lot sizes of less than the minimum lot size as specified by law for lots created by a consolidation of existing lots within an agricultural district and the resubdivision thereof; provided that the consolidation and resubdivision do not result in an increase in the number of lots over the number existing prior to consolidation; and provided further that in no event shall a lot which is equal to or exceeds the minimum lot size of one acre be less than that minimum after the consolidation and resubdivision action.  The county may also allow lot sizes of less than the minimum lot size as specified by law for lots created or used for plantation community subdivisions as defined in section 205-4.5(a)(12), for public, private, and quasi-public utility purposes, and for lots resulting from the subdivision of abandoned roadways and railroad easements.

(c) Unless authorized by special permit issued pursuant to this chapter, only the following uses shall be permitted within rural districts:

(1) Low density residential uses;

(2) Agricultural uses;

(3) Golf courses, golf driving ranges, and golf-related facilities;

(4) Public, quasi-public, and public utility facilities; and

(5) Geothermal resources exploration and geothermal resources development, as defined under section 182-1.

In addition, the minimum lot size for any low density residential use shall be one-half acre and there shall be but one dwelling house per one-half acre, except as provided for in section 205-2.

14

Commission also recognized that the legislature delegated authority to enforce uses within conservation districts to the Department.

The Commission consequently concluded:

20. Based on the information provided by Petitioners, the Commission concludes that the Petition involves lands that are currently classified within the State Land Use Conservation District.

21. Based on the information provided by Petitioners, the Commission concludes that it lacks authority under HRS Chapter 205 to require a landowner to petition for reclassification.

22. Based on the information provided by Petitioners, the Commission concludes that pursuant to HRS §§ 205-5(a), 205-15, and HRS §§ 183C-3 and 183C-6(a), it is the Department of Land and Natural Resources and not the Commission, [sic] that is statutorily authorized to determine, permit, and enforce land uses within the State Conservation District.

23. The Commission concludes that the plain language of HRS § 205-5(a) makes clear that governance over the State Conservation District is under the authority of the DLNR pursuant to HRS § 183C. Therefore, the Commission lacks subject matter jurisdiction and must deny the Petition.

The Commission summarized the reasons for its denial of the Kanaheles' petition: "[t]he Petitioner[s] ha[ve] requested a ruling on a statutory provision not administered by the Commission and a matter that is not otherwise within the jurisdiction of the Commission."

**F.   The Kanaheles' Appeal**

The following day, the Kanaheles filed a notice of appeal before this court. This court granted intervenor status

15

to TMT International Observatory LLC (TIO) and UH over the Kanaheles' objections.

The parties' arguments and relevant procedural background are detailed as necessary in the Discussion section below. The Commission, TIO, and UH contend that this court lacks jurisdiction over the Kanaheles' merits claims, and that the LUC Order was correctly decided. Meanwhile, the Kanaheles contend this court has jurisdiction to consider the appeal and raise four points of error, with multiple sub-arguments in each. The Kanaheles' overarching points of error are:

> (1) The LUC clearly erred, arbitrarily, and incorrectly concluded, [sic] the Kanaheles "requested a ruling on a statutory provision not administered by the [LUC] and a matter that is not otherwise within the jurisdiction of the [LUC]."

> (2) Finding of fact (FOF) ¶22, which is a legal conclusion in substance, constituted clear error and is incorrect as a legal conclusion. FOF ¶22 provides: "Based on the Petition, [the Kanaheles'] arguments and responses to questions by the Commissioners, and the testimony of the Petitioners, Petitioner's [sic] seek a declaratory order from the Commission requiring that a district boundary amendment be obtained for the Property."

> (3) The LUC incorrectly concludes:

>> The Hawai'i Supreme Court has considered and ruled on permitting and jurisdictional issues regarding Mauna Kea [sic] in Mauna Kea Anaina Hou v. Bd. Of Land & Nat. Res., 136 Hawaii 376, 363 P.3d 224 (2015) [Mauna Kea I] and Matter of Conservation District Use Application HA-3568 for the Thirty Meter Telescope, 143 Hawaii 379, 431 P.3d 752 (2018) [Mauna Kea I] [sic].

> The Kanaheles' [sic] rebutted this position through their filings and oral statements.

> (4) Under FOF ¶26, "the [LUC] further concludes that the declaratory procedure could not be invoked by the Petitioner in this matter. . ." FOF ¶26, which is a legal

16

conclusion in substance, constitutes clear error and is an incorrect legal conclusion.  The Kanaheles pointed out that CARD did not apply because they were "not seeking review of BLNR's decision because BLNR never had the authority to redistrict lands and didn't make a decision on that issue."

(Underscored [sic] notations in the Kanaheles' Opening Brief) (citations omitted).

## II.  STANDARDS OF REVIEW

### A.  Jurisdiction

"The existence of jurisdiction is a question of law that we review de novo under the right/wrong standard.  Questions regarding subject matter jurisdiction may be raised at any stage of a cause of action."  Lingle v. Haw. Gov't Emps. Ass'n, AFSCME, Local 152, 107 Hawai‘i 178, 182, 111 P.3d 587, 591 (2005) (quoting Amantiad v. Odum, 90 Hawai‘i 152, 158-59, 977 P.2d 160, 166-67 (1999)).

### B.  Statutory Interpretation

"The interpretation of a statute is a question of law which this court reviews de novo."  Keep the N. Shore Country v. Bd. of Land & Nat. Res., 150 Hawai‘i 486, 506 P.3d 150 (2022) (citing State v. Ruggiero, 114 Hawai‘i 227, 231, 160 P.3d 703, 707 (2007)).

### C.  Administrative Agency Appeals

This court's review of administrative agency decisions is governed by HRS § 91-14(g).  The statute provides:

> Upon review of the record, the court may affirm the
> decision of the agency or remand the case with instructions

17

for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

    (1) In violation of constitutional or statutory provisions;

    (2) In excess of the statutory authority or jurisdiction of the agency;

    (3) Made upon unlawful procedure;

    (4) Affected by other error of law;

    (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

    (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91-14(g) (Supp. 2016). "[U]nder HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." Paul's Elec. Serv., Inc. v. Befitel, 104 Hawaiʻi 412, 416, 91 P.3d 494, 498 (2004) (brackets in original) (quoting In re Hawaiian Elec. Co., 81 Hawaiʻi 459, 465, 918 P.2d 561, 567 (1996)).

### III. DISCUSSION

**A.   This Court Has Jurisdiction over the Kanaheles' Appeal.**

    The Commission, TIO, and UH argue that this court lacks jurisdiction to hear the Kanaheles' direct appeal of the LUC Order. The Commission and TIO contend that because the

18

Kanaheles' petition was not a contested case, this court does not possess jurisdiction under HRS § 205-19(a) (2017 and Supp. 2019), which only authorizes this court to directly review a final decision or order of contested cases under HRS chapter 205.

In contrast, the Kanaheles argue that this court has jurisdiction over the instant appeal pursuant to HRS §§ 205-19(a), 91-8 (2012), and 91-14(b) (Supp. 2016), given this court's statutory interpretation of HRS §§ 91-8 and 91-14 in Lingle, 107 Hawaiʻi 178, 111 P.3d 587.  The Kanaheles posit that Lingle held that HRS §§ 91-8 and 91-14 are to be "read together," making declaratory and contested case orders share the same status for purposes of judicial review.  See id. at 185-86, 111 P.3d at 594-95.  Therefore, because HRS § 205-19 authorizes this court to directly review orders from contested cases, HRS § 205-19 also authorizes this court to directly review orders granting or denying declaratory order petitions, given the shared status of declaratory and contested case orders.

The Kanaheles are correct that this court possesses jurisdiction to hear their appeal.

"The right to appeal is purely statutory and exists only when jurisdiction is given by some constitutional or statutory

19

provision." Id. at 184, 111 P.3d at 593. The statutes pertinent to this court's jurisdiction over the Kanaheles' appeal are HRS §§ 91-8, 91-14, and 205-19.

HRS § 91-14 authorizes judicial review of a final decision or order in a contested case.[7] However, the LUC Order denying declaratory relief did not result from a contested case, as the Kanaheles acknowledged. A contested case is "a proceeding in which the legal rights, duties, or privileges of

---

[7]    HRS § 91-14 (2012 and Supp. 2016) provides in relevant part:

> (a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law. Notwithstanding any other provision of this chapter to the contrary, for the purposes of this section, the term "person aggrieved" shall include an agency that is a party to a contested case proceeding before that agency or another agency.
>
> (b) Except as otherwise provided herein, proceedings for review shall be instituted in the circuit court or, if applicable, the environmental court, within thirty days after the preliminary ruling or within thirty days after service of the certified copy of the final decision and order of the agency pursuant to rule of court, except where a statute provides for a direct appeal to the supreme court or the intermediate appellate court, subject to chapter 602. In such cases, the appeal shall be treated in the same manner as an appeal from the circuit court to the supreme court or the intermediate appellate court, including payment of the fee prescribed by section 607-5 for filing the notice of appeal (except in cases appealed under sections 11-51 and 40-91). The court in its discretion may permit other interested persons to intervene.
>
> . . . .

20

specific parties are required by law to be determined after an

opportunity for agency hearing."  HRS § 91-1 (Supp. 2017).

> If the statute or rule governing the activity in question does not <u>mandate</u> a hearing prior to the administrative agency's decision-making, the actions of the administrative agency are not "required by law" and do not amount to "a final decision or order in a contested case" from which a direct appeal . . . is possible.

Bush v. Hawaiian Homes Comm'n, 76 Hawai'i 128, 134, 870 P.2d

1272, 1278 (1994).  "Stated differently, discretionary hearings

are not contested cases because they are not required by law."

Lingle, 107 Hawai'i at 184, 111 P.3d at 593.  The Commission's

hearing on the Kanaheles' petition was purely discretionary: a

hearing was not required by administrative rule, statute or

constitution.[8]  The Commission's discretionary hearing did not

---

8      Under HRS § 91-8, "[e]ach agency shall adopt rules prescribing . . . the procedure for . . . consideration" of petitions for declaratory rulings. The Commission's rules provide:

> <u>Consideration of petition for declaratory order.</u>  (a) The commission, within ninety days after submission of a petition for declaratory order, shall:
> (1)  Deny the petitioner where:
>     (A)  The question is speculative or purely hypothetical and does not involve an existing situation or one which may reasonably be expected to occur in the near future; or
>     (B)  The petitioner's interest is not of the type which confers sufficient standing to maintain an action in a court of law; or
>     (C)  The issuance of the declaratory order may adversely affect the interest of the State, the commission, or any of the officers or employees in any litigation which is pending or may be reasonably be [sic] expected to arise; or
>     (D)  The petitioner requests a ruling on a statutory provision not administered by the commission or the matter is not otherwise

transform the LUC Order into a contested case decision.  See id.

As such, the Kanaheles were not parties to a contested case

hearing and their petition could not be reviewed directly as a

contested case order under HRS § 91-14.

However, HRS §§ 91-8, 91-14, and 205-19 together provide

for this court's review of the Kanaheles' appeal of the LUC

Order, even though the LUC Order was not part of a contested

case.  HRS § 91-8 establishes the framework for declaratory

rulings by agencies, and provides that "[o]rders disposing of

petitions [for declaratory rulings] shall have the same status

as other agency orders."  This court interpreted the "same

---

> within the jurisdiction of the commission;
> or
> (2)  Issue a declaratory order on the matters
>      contained in the petition; or
> (3)  Set the petition for hearing before the
>      commission or a hearings officer in accordance
>      with this subchapter.  The procedures set forth
>      in subchapter 7 shall be applicable.

Hawaiʻi Administrative Rules (HAR) § 15-15-100(a) (2019).  Relatedly, HAR § 15-15-103 (2019) provides:

> Declaratory orders; request for hearing.  The
> commission may, but shall not be required to, conduct a
> hearing on a petition for declaratory order.  Any
> petitioner or party in interest who desires a hearing on a
> petition for a declaratory order shall set forth in detail
> in the request the reasons why the matters alleged in the
> petition, together with supporting affidavits or other
> written briefs or memoranda of legal authorities, will not
> permit the fair and expeditious disposition of the
> petition, and to the extent that the request for a hearing
> is dependent upon factual assertion, shall accompany the
> request by affidavit establishing those facts.

(Emphasis added.)  Based on this language, the Commission was not required to
hold a hearing to resolve the Kanaheles' petition.

status" language of HRS § 91-8 and held that orders disposing of petitions for declaratory rulings, like orders in contested cases, are subject to judicial review pursuant to HRS § 91-14. Lingle, 107 Hawaiʻi at 185-86, 111 P.3d at 594-95. Therefore, we held that a Hawaiʻi Labor Relation Board order denying the petitioner for declaratory relief was subject to review by the circuit court, even though the decision did not result from a contested case. Id. at 185, 111 P.3d at 595.

Subsequently, in 2016 the legislature amended HRS § 91-14(b) to provide for direct review by the supreme court or the intermediate appellate court when provided by statute. 2016 Haw. Sess. Laws Act 48, § 5 at 77.[9] Now HRS § 91-14(b) provides that "proceedings for review shall be instituted in the circuit court . . . except where a statute provides for a direct appeal to the supreme court or the intermediate appellate court[.]" In the same 2016 Act, the legislature enacted HRS § 205-19, regarding contested cases arising under HRS chapter 205. 2016 Haw. Sess. Laws Act 48 § 3, at 76-77. HRS § 205-19 provides: "any contested case under this chapter shall be appealed from a final decision and order or a preliminary ruling that is of the nature defined by section 91-14(a) upon the record directly to

---

[9] The legislature repealed and reenacted HRS § 91-14(b) without any changes to the language on July 1, 2019. See 2016 Haw. Sess. Laws Act 48, § 14 at 82; 2019 Haw. Sess. Laws Act 213, at 637.

23

the supreme court for final decision." This court must presume the legislature was aware of Lingle when it passed Act 48 in 2016. See Peer News LLC v. City & Cnty. of Honolulu, 138 Hawai'i 53, 69, 376 P.3d 1, 17 (2016) ("The legislature is presumed to know the law when it enacts statutes, including this court's decisions, and agency interpretations.") (citations omitted). Therefore, this court's interpretation in Lingle of HRS §§ 91-8 and 91-14 that declaratory orders have the "same status" for judicial review as orders in contested cases applies to HRS § 205-19. See Lingle, 107 Hawai'i at 185-86, 111 P.3d at 594-95. Thus, pursuant to HRS §§ 91-8, 91-14 and 205-19, this court has jurisdiction to directly review the Kanaheles' appeal.

**B.  The Commission Correctly Determined That It Lacked Jurisdiction over the Kanaheles' Petition.**

Before turning to the merits of the Kanaheles' petition and appeal, some clarification regarding the Kanaheles' requested relief is necessary. Again, the Kanaheles seek three declaratory orders stating:

> (1) current industrial research facility uses in the [Astronomy Precinct] are appropriate within the urban district as prescribed by HRS § 205-2(b) and not the conservation district;
>
> (2) further industrial uses proposed for the [Astronomy Precinct] must comply with HRS chapter 205 and Commission procedures for obtaining a district boundary amendment to reclassify conservation lands into the urban district; and,
>
> (3) even if a single scientific laboratory or other research facility may be appropriate within non-urban districts, the successive, individual approval of thirteen

24

> scientific laboratories, other research facilities, and
> associated offices, parking lots, and utilities, within the
> [Astronomy Precinct] constitutes urban uses inconsistent
> with conservation district uses and/or detrimental to a
> multiple use conservation concept for which a district
> boundary amendment must be obtained.

The Kanaheles are not asking the Commission to issue a district boundary amendment to convert the Astronomy Precinct from a conservation district to an urban district.  In fact, the Kanaheles made clear that they would oppose any district boundary amendment petition seeking such a reclassification.[10]

Instead, the Kanaheles are asking the Commission to determine what constitutes prohibited uses of conservation district lands via an interpretation of HRS § 205-2(e).  As the Kanaheles' counsel explained:

> We're asking you just to interpret 205 and say the
> concentration of industrial research facilities on Mauna
> Kea are appropriate uses or are appropriate within the
> urban district or in an urban district as prescribed by
> 205-2 and not the conservation district.  Further
> industrial uses must comply with boundary amendment
> procedures to reclassify those lands into the urban
> district.

The Kanaheles sought this determination as a method for the Commission to enforce its prior districting of the Astronomy Precinct as a conservation district.[11]  At the October

---

[10]     In the declarations attached to the Kanaheles' petition before the Commission, Ku'ulei Kanahele and Ahiena Kanahele both stated: "I would participate to strongly oppose a proposed boundary amendment to reclassify conservation district lands at the Maunakea [sic] summit into the Urban district."

[11]     The dissent posits that the Commission possesses authority to consider the cumulative impacts of conservation district use permits (CDUPs) and determine whether the Astronomy Precinct is more appropriately classified as

25, 2019 hearing on the Kanaheles' petition before the Commission, the Kanaheles' attorney stated: "We're not seeking enforcement of anything except for [HRS chapter] 205."[12]  The Kanaheles' counsel acknowledged that "the legal effect of [the Kanaheles'] petition is to . . . force the State of Hawaiʻi or whoever might be considered the landowner of the land on which the telescopes sit to have to file a request for a [district] boundary amendment."  The Kanaheles' counsel stated that in the event that a district boundary amendment petition is denied, the astronomy facilities "would either have to come down, or they would reapply and try to find another way to mitigate it better."

---

an urban rather than conservation district.  The dissent cites to Lanihau Properties, LLC., No. A00-730, (Hawaiʻi Land Use Comm'n, 2003) in order to demonstrate this point.  However, this argument is unavailing.  In Lanihau Properties, a party with a property interest entitled to seek reclassification requested redistricting in order to develop a business park. Id. at 2, 7.  In contrast, the Kanaheles explicitly stated that they are not seeking to reclassify lands.  Rather, the Kanaheles are asking the Commission to determine what constitutes prohibited uses on conservation district land, and therefore to enforce the conservation district classification.  The Commission does not have the authority to enforce uses on conservation district lands.  See infra Section B(3)(a).  As such, the dissent's arguments in this regard are inapposite.

12    In the Kanaheles' Reply to TIO's Answering Brief, the Kanaheles argued HRS § 205-2(e) describes "uses of land that the LUC properly considers in determining and enforcing conservation district use boundaries." (Emphasis added.)

Moreover, as the Kanaheles acknowledged, the Kanaheles would use the district boundary amendment proceedings to protest the development of the Astronomy Precinct.[13]

In short, the Kanaheles requested the three declaratory rulings to enforce the Commission's classification of the Astronomy Precinct as a conservation district and to protest the ongoing development of the Astronomy Precinct.

1. **The Commission correctly determined that the Kanaheles sought a declaratory order requiring a district boundary amendment for the Astronomy Precinct.**

The Kanaheles dispute the Commission's finding that "[b]ased on the Petition, [the Kanaheles'] arguments and responses to questions by the Commissioners, and the testimony of the Petitioners, Petitioner's [sic] seek a declaratory order from the Commission requiring that a district boundary amendment be obtained for the Property." The Kanaheles contend they only "sought declaratory orders and not an order that a boundary amendment be obtained for the property," and the requested declaratory orders would not compel UH to seek a district boundary amendment because UH would have the option to remove the astronomy facilities.

---

[13] During the October 25, 2019 hearing before the Commission, Kuʻulei Kanahele stated: "we are asking for that district boundary amendment so we have the opportunity to protest."

However, the plain language of the Kanaheles' petition requested a declaratory order that explicitly required a district boundary amendment.  The Kanaheles' third requested declaratory order would state that the current uses of the Astronomy Precinct "constitute[] urban uses inconsistent with conservation district uses and/or detrimental to a multiple use conservation concept for which <u>a district boundary amendment must be obtained</u>."  (Emphasis added.)

Consistent with the language of the third requested declaratory order, the Kanaheles consistently represented the requested declaratory relief would require a district boundary amendment to the Commission.  At the October 25, 2019 hearing before the Commission, the Kanaheles admitted that "the legal effect of [the Kanaheles'] petition is to . . . force the State of Hawai'i or whoever might be considered the landowner of the land on which the telescopes sit to have to file a request for a boundary amendment."  The Kanaheles further explained that such a declaratory order by the Commission would create an enforcement requirement because, "by virtue of saying that those uses are outside or supposed to be in the urban district, that in itself, <u>because the agencies are expected to comply, . . . would put them in a situation where, yes, they would have to do a [district] boundary amendment</u>."  (Emphasis added.)  The

Kanaheles also represented that a district boundary amendment must be filed and granted or else the astronomy facilities "would . . . have to come down."

Because the plain language of the Kanaheles' third requested declaratory order and their representations to the Commission make clear that the Kanaheles requested a declaratory order requiring a district boundary amendment, the Commission did not err by concluding the Kanaheles sought a declaratory order requiring a district boundary amendment be obtained.

Furthermore, the Kanaheles' distinction that UH could simply remove the astronomy facilities is one without a difference. According to the Kanaheles, they did not seek a declaratory order requiring that a district boundary amendment be obtained because the Commission would only issue a declaratory ruling that a district boundary amendment must be obtained to continue existing uses "inconsistent with conservation district concepts." Either way, the requested declaratory order would require a district boundary amendment, at which point UH would have two avenues to comply with the Commission's determination: (1) UH could "voluntarily" request a district boundary amendment or (2) UH could comply through "removal of the industrial uses from the conservation district," as the Kanaheles explained. The fact two avenues exist through

29

which compliance with the requested declaratory order is possible is irrelevant to the substance of the requested declaratory order.  The Kanaheles' requested declaratory relief would require a district boundary amendment in order for the astronomy facilities to continue operating.

2. **The Commission correctly determined that it lacked jurisdiction to issue the requested declaratory orders.**

The Kanaheles also argue "the LUC reversibly erred by ruling it lacked jurisdiction to issue declaratory orders on a matter not within its jurisdiction."  The Kanaheles argue that the Commission's ruling: (a) "is inconsistent with the LUC's own conclusion that it holds jurisdiction to issue the requested declaratory order"; (b) is invalid because it purports to alter and restrict HRS chapter 205; (c) is premised on incorrect legal conclusions; and (d) is premised on clear error.

a. **The Commission possesses jurisdiction to determine the boundaries of its jurisdiction.**

The Kanaheles first challenge the Commission's conclusion that:

> The Commission has jurisdiction to issue this declaratory order.  HRS § 91-8, as implemented by the Commission's administrative rules, HAR [Hawaiʻi Administrative Rules] §§ 15-15-98 through 15-15-104.1, authorize the Commission to issue a declaratory order "as to the applicability of any statutory provision or of any rule or order of the commission to a specific factual situation."  The Commission's statutes, the applicability of which are put at issue in this Petition, are those sections of HRS Chapter 205 that govern the authority to reclassify land and to govern the permitted uses on State Conservation District Lands.

30

According to the Kanaheles, "LUC concedes it has jurisdiction to issue 'this declaratory order' and the Petition 'put at issue' the LUC's statutes and rules," so therefore the Commission's "ruling that the Kanaheles requested a ruling on matters not administered or within the jurisdiction of the LUC must be incorrect."

The Kanaheles misconstrue the Commission's conclusion. The first sentence of the conclusion is: "The Commission has jurisdiction to issue this declaratory order" — i.e., the Commission has jurisdiction to enter a declaratory order concluding that it lacks jurisdiction. (Emphasis added.) This follows the axiom that a decision-making body always has authority to determine whether it has jurisdiction. See, e.g., State v. Brandimart, 68 Haw. 495, 497, 720 P.2d 1009, 1010 (1986) ("A court always has jurisdiction to determine whether it has jurisdiction over a particular case."). If the decision-making body concludes it lacks jurisdiction, it may issue a decision stating as much. See id. The only prohibition is that the decision-making body "may not be able to maintain jurisdiction for the purpose of determining the merits of the case." Id.

Moreover, although it is true that the Commission has the authority to issue "a declaratory order as to the

applicability of any statutory provision or of any rule or order of [LUC]," HRS § 91-8,[14] this authority is not available when, for example, "[t]here is no longer a question of how the relevant laws . . . 'apply.'" CARD, 114 Hawai'i at 156, 159 P.3d at 197. As discussed below, such is the case here. See infra Section B(3). Consequently, the declaratory ruling procedure is not available for determining the applicability of HRS chapter 205. See CARD, 114 Hawai'i at 156, 159 P.3d at 197.

### b. The Commission's ruling does not purport to alter or restrict HRS chapter 205.

The Kanaheles next challenge the LUC Order by contending that the Commission improperly "attempt[ed] to modify, alter, or restrict the scope of HRS chapter 205." The Kanaheles emphasize that HRS § 205-2 grants the Commission jurisdiction over "all land," including "over the classification or reclassification of certain conservation district lands."

But the fact that HRS §§ 205-2(a)(4) and 205-4 authorize the Commission to reclassify conservation district

---

[14] HRS § 91-8 provides:

> Any interested person may petition an agency for a declaratory order as to the applicability of any statutory provision or of any rule or order of the agency. Each agency shall adopt rules prescribing the form of the petitions and the procedure for their submission, consideration, and prompt disposition. Orders disposing of petitions in such cases shall have the same status as other agency orders.

lands does not mean that the Commission can use its classification authority to enforce land uses within the Astronomy Precinct.  Rather, the legislature vested such enforcement authority in the Department through HRS § 205-5(a). See HRS § 205-5(a) ("Conservation districts shall be governed by the department of land and natural resources pursuant to chapter 183C."); HRS § 183C-3(7) (2011) ("The board and department shall . . . [e]stablish and enforce land use regulations on conservation district lands . . . .").  Had the legislature intended to grant the Commission any authority over the governance of conservation district lands, it could have done so.  See, e.g., HRS § 205-5(b)-(c); HRS § 205-6(d) (2017).  It did not.  See generally HRS chapter 205.  Insofar as this court "must read statutory language in the context of the entire statute," it is the Kanaheles who cabin the scope of HRS chapter 205 by disregarding the powers granted to the Department through HRS § 205-5(a).  See Gray v. Admin. Dir. of the Ct., 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (emphasis added) (quoting State v. Toyomura, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995)).

> **c.  The Commission's ruling is not premised on incorrect legal conclusions.**

The Kanaheles also challenge the LUC Order for creating "a false equivalence between DLNR's governance of the conservation district and the LUC's jurisdiction to classify and

reclassify lands." But it was the Kanaheles who articulated that equivalence by asking the Commission to use its classification power to determine what constitutes prohibited uses within the Astronomy Precinct and, in turn, to enforce the prior conservation district classification.

Under these circumstances, the LUC Order does not indicate that the Department's granting of successive conservation district use permits precluded the Commission from reclassifying the Astronomy Precinct. Rather, the LUC Order simply recognized that the legislature delegated the authority to control land uses within conservation districts — and therefore the Astronomy Precinct — to the Department. Insofar as the legislature did not authorize the Commission to determine what constitutes prohibited uses of conservation district lands, the Commission's use of its classification authority to govern the Astronomy Precinct would create the epitome of an administrative act "in excess of the statutory authority or jurisdiction of the agency." See HRS § 91-14(g)(2); supra Section B(2)(b); infra Section (B)(3)(a).

> d. **The Commission's ruling is not premised on clear error.**

The Kanaheles further challenge the LUC Order because the Commission denied the Kanaheles' petition on the basis that "[t]he petitioner has requested a ruling on a statutory

34

provision not administered by the Commission . . . ."  According to the Kanaheles, the requested declaratory rulings would only implicate HRS chapter 205 because "HRS chapter 205 puts the LUC in charge of amending land use district boundaries and DLNR does not have that power."  Again, however, the Kanaheles are not asking the Commission to reclassify the Astronomy Precinct from a conservation district to a different district.  Instead, the Kanaheles are asking the Commission to determine what constitutes prohibited land uses within a conservation district and to thereby enforce the Astronomy Precinct's conservation district designation.  Insofar as the legislature delegated the authority to govern conservation district land uses to the Department under HRS § 205-5(a) and HRS chapter 183C, the Commission did not err in concluding that the Kanaheles "requested a ruling on a statutory provision not administered by the Commission."

3.    **The Commission correctly interpreted CARD as precluding the Kanaheles' petition.**

Lastly, the Kanaheles argue that the Commission improperly "interpreted CARD to require denial of the Kanaheles' petition on the basis that [the Department] had already rendered a decision on the matter."  The Kanaheles insist that their petition does not run afoul of CARD because (a) it does not constitute an attempt to evade a prior decision; and (b) CARD

35

arose in a distinguishable procedural posture. The Kanaheles also contend that the Commission's application of CARD "would cause an absurd situation in which any county or state agency decision concerning any land would foreclose the LUC's power to reclassify that land or a larger area within which that land was located." This point of error is meritless.

### a. The Commission lacks jurisdiction to issue a declaratory order to review the Department's already-made decisions.

Pursuant to HRS § 91-8:

> Declaratory rulings by agencies. Any interested person may petition an agency for a declaratory order as to the applicability of any statutory provision or of any rule or order of the agency. Each agency shall adopt rules proscribing the form of the petitions and the procedure for their submission, consideration, and prompt disposition. Orders disposing of petitions in such cases shall have the same status as other agency orders.

This court discussed the boundaries of agencies' declaratory ruling authority in CARD, 114 Hawai'i 184, 159 P.3d 143. We explained:

> As both the title ("Declaratory rulings by agencies") and the pertinent text ("a declaratory order as to the applicability [of a statute, agency rule, or order]") make clear, the declaratory ruling procedure of HRS § 91-8 is meant to provide a means of seeking a determination of whether and in what way some statute, agency rule, or order applies to the factual situation raised by an interested person. It was not intended to allow review of concrete agency decisions for which other means of review are available. Reading HRS § 91-8 in a common sense fashion, and bearing in mind the plain meaning of the term "applicability," it cannot seriously be maintained that the procedure was intended to review already-made agency decisions. For such decisions, . . . the agency has already spoken as to the "applicability" of the relevant law to the factual circumstances at hand — implicitly or explicitly it has found the relevant legal requirements to

> be met. There is no longer a question of how the relevant laws . . . "apply."
>
> Use of the declaratory ruling procedural device only makes sense where the applicability of relevant law is unknown, either because the agency has not yet acted upon particular factual circumstances, or for some other reason the applicability of some provisions of law have not been brought into consideration.

Id. at 196-97, 159 P.3d at 155-56.

In this case, the Department has already spoken to the applicability of the laws implicated by the Kanaheles' petition. Pursuant to its statutory authority, the Department has determined that the astronomy facilities constitute permissible uses within the Astronomy Precinct.

According to the Kanaheles, CARD "prohibits using declaratory petitions to review specific decisions made by the same agency from which declaratory orders were requested." Using this framework, the Kanaheles argue that their "petition could not constitute an attempt to evade a prior decision by the LUC or any other agency because no other agency has the authority to render declaratory rulings on the classification of lands into districts and the redistricting of lands."

As a preliminary matter, the Kanaheles' focus on the Commission's reclassification powers is irrelevant. Again, the Kanaheles are not asking the Commission to reclassify the Astronomy Precinct from a conservation district into an urban district. The Kanaheles want a declaration that the astronomy facilities are not permitted land uses within a conservation

37

district.  As such, the Kanaheles' discussion of the

Commission's authority to amend district boundaries and

reclassify lands is not relevant to their request for a

declaration on permitted uses within conservation districts.

Additionally, the Kanaheles' initial claim that CARD

prohibits review of decisions "made by the same agency from

which declaratory orders were requested" finds no footing in

CARD.  CARD's key holding to this case is that HRS § 91-8 does

not allow for review of already-made decisions because, in such

scenarios, "[t]here is no longer a question of how the relevant

laws . . . 'apply.'"  114 Hawai'i at 197, 159 P.3d at 156.  In

other words, the declaratory ruling procedure is no longer

available when a decision-making body with authority to address

the question at issue provides an answer.  See id.  Such is the

case here.

"An administrative agency can only wield powers

expressly or implicitly granted to it by statute."  Morgan v.

Planning Dep't, Cnty. of Kaua'i, 104 Hawai'i 173, 184, 86 P.3d

982, 993 (2004) (quoting TIG Ins. Co. v. Kauhane, 101 Hawai'i

311, 327, 67 P.3d 810, 826 (App. 2003)).  The legislature did

not grant the Commission any authority to restrict conservation

district land uses; the legislature delegated that power to the

Department.  Pursuant to HRS § 205-5(a), "[c]onservation

38

districts shall be governed by the department of land and natural resources pursuant to chapter 183C." Under HRS § 183C-3 (2011), the Department shall:

>    (1)  Maintain an accurate inventory of lands classified within the state conservation district by the state land use commission, pursuant to chapter 205;
>
>    (2)  Identify and appropriately zone those lands classified within the conservation district;
>
>    (3)  Adopt rules, in compliance with chapter 91 which shall have the force and effect of law;
>
>    (4)  Set, charge, and collect reasonable fees in an amount sufficient to defray the cost of processing applications for zoning, use, and subdivision of conservation lands;
>
>    (5)  Establish categories of uses or activities on conservation lands, including allowable uses or activities for which no permit shall be required;
>
>    (6)  Establish restrictions, requirements, and conditions consistent with the standards set forth in this chapter on the use of conservation lands; and
>
>    (7)  Establish and enforce land use regulations on conservation district lands including the collection of fines for violations of land use and terms and conditions of permits issued by the department.

(Emphasis added.)

>    In contrast, under HRS § 205-2,

>    (a)  There shall be four major land use districts in which all lands in the State shall be placed: urban, rural, agricultural, and conservation. The land use commission shall group contiguous land areas suitable for inclusion in one of these four major districts. The commission shall set standards for determining the boundaries of each district, provided that:
>
>    . . . .
>
>    (1)  In the establishment of the boundaries of conservation districts, the "forest and water reserve zones" provided in Act 234, section 2, Session Laws of Hawaii 1957, are renamed "conservation districts" and, effective as of July 11, 1961, the boundaries of the forest and

water reserve zones theretofore established pursuant to Act 234, section 2, Session Laws of Hawaii 1957, shall constitute the boundaries of the conservation districts; provided that thereafter the power to <u>determine the boundaries</u> of the conservation districts shall be in the commission.

. . . .

(e) <u>Conservation districts shall include</u> areas necessary for protecting watersheds and water sources; preserving scenic and historic areas; providing park lands, wilderness, and beach reserves; conserving indigenous or endemic plants, fish, and wildlife, including those which are threatened or endangered; preventing floods and soil erosion; forestry; open space areas whose existing openness, natural condition, or present state of use, if retained, would enhance the present or potential value of abutting or surrounding communities, or would maintain or enhance the conservation of natural or scenic resources; areas of value for recreational purposes; other related activities; and <u>other permitted uses not detrimental to a multiple use conservation concept</u>. Conservation districts shall also include areas for geothermal resources exploration and geothermal resources development, as defined under section 182-1.

(Emphasis added.)

Reading these statutes in conjunction with one another, it is evident that the Commission lacks authority to <u>prohibit</u> land uses within the conservation districts. Under HRS § 205-2(a), the Commission "determine[s] <u>the boundaries</u> of the conservation districts." (Emphasis added.) HRS § 205-2(e) identifies, in turn, areas and uses that "[c]onservation districts shall include[.]" While this language indicates what may be included within conservation districts, it does not grant the Commission authority to use the conservation district classification to exclude certain land uses from the conservation district boundaries. Had the legislature wished to

40

grant the Commission such power, it could have done so as it did with the agricultural and rural districts.  For instance, the legislature dictates that "[w]ithin the agricultural district, all lands . . . shall be restricted to the following permitted uses."  HRS § 205-4.5(a) (2017).  The legislature similarly mandates that "[u]nless authorized by special permit issued pursuant to this chapter, only the following uses shall be permitted within rural districts."  HRS § 205-5(c).  In these two cases, if an unauthorized land use is included within either the agricultural or rural district, either the governing county must terminate the use under HRS § 205-12 (2017) or the Commission could reclassify the land.  At no point does HRS § 205-2(e) contain any of the limiting language used in HRS §§ 205-4.5 or 205-5(c).  Nor does HRS § 205-2(e) identify any areas or land uses that the Commission may not include within conservation district boundaries.  As such, HRS § 205-2(e) does not provide any basis by which the Commission can exclude land uses within the Astronomy Precinct, or be required to reclassify the Astronomy Precinct because such land uses are present.

Moreover, HRS chapter 183C and HRS § 205-5(a) establish that the Commission lacks authority to enforce land use restrictions within the conservation district boundaries.  This is because HRS § 183C-3(7) authorizes the Department to

41

enforce conservation district land use restrictions.  See also

HRS § 205-12 ("The appropriate officer or agency charged with

the administration of county zoning laws shall enforce within

each county the use classification districts adopted by the land

use commission") (emphasis added).

Insofar as (1) it is the Department's responsibility

to identify permissible land uses within a conservation district

and (2) the Department has determined that the astronomy

facilities constitute permissible conservation district land

uses, the Kanaheles may not use the declaratory ruling procedure

to seek review of the Department's prior determinations.  See

CARD, 114 Hawaiʻi at 196-97, 159 P.3d at 155-56.  At this point,

"[t]here is no longer a question of how the relevant laws . . .

'apply.'"  Id.  The Commission is consequently barred from

issuing any of the requested declaratory orders.  See id.[15]

_____

[15]    The Planning Office's state land use district boundary reviews also align with the Department's determination.  Pursuant to HRS § 205-18, "[t]he office of planning and sustainable development may undertake a review of the classification and districting of all lands in the State" and "may initiate state land use boundary amendments which it deems appropriate to conform to these plans [the Hawaii state plan, county general plans, and county development and community plans]."  The Planning Office completed its first state land use district boundary review in 1992.  See 1992 Boundary Review. At that time, the Planning Office was aware that UH intended to construct thirteen telescopes within the Astronomy Precinct by 2000.  1992 Boundary Review at 23.  These thirteen telescopes constitute the current uses the Kanaheles identify in requested declaratory orders one and three.  The Planning Office did not recommend reclassifying the Astronomy Precinct from a conservation district into a different district at that time.  1992 Boundary Review at 121-27 (discussing recommended amendments).  To the extent the Planning Office could have pointed to the thirteen telescopes and their associated facilities as a reason to reclassify the Astronomy Precinct, it did not.  See id.  Further, the 2022 Boundary Review was conducted long after

42

b. **The Kanaheles' contention that they sought the Commission's interpretation of HRS chapter 205 rather than an enforcement order is irrelevant in light of <u>CARD</u>.**

Because the Commission is barred from issuing any of the requested declaratory orders, the Kanaheles' contention that they merely "sought the LUC's interpretation of HRS chapter 205 and implementing rules concerning certain uses of conservation lands and not an enforcement order assessing penalties or imposing injunctive relief for actual uses in violation of statutory requirements" is irrelevant. Because the sought declaratory orders would review the Department's prior determinations, the Commission is barred from issuing the orders. See <u>CARD</u>, 114 Hawai'i at 196-97, 159 P.3d at 155-56.

c. **<u>CARD</u>'s procedural posture is irrelevant.**

The Kanaheles point out that "the procedural posture" of the present case and <u>CARD</u> "are entirely distinct." However, the Kanaheles do not provide any explanation as to why this matters. Given that the Kanaheles do not articulate how or why the "entirely distinct" procedural postures must lead to different results, <u>CARD</u>'s procedural posture appears irrelevant.

---

UH proposed the TMT and did not recommend reclassification of the Astronomy Precinct. Under these circumstances, the Planning Office appears to have implicitly adopted the Department's determination that the current industrial research facility uses within the Astronomy Precinct are <u>appropriate</u> within the conservation district, and - contrary to the Kanaheles' third requested declaratory order - are uses consistent "with conservation district uses" and not "detrimental to a multiple use conservation concept."

**d.    The LUC Order does not create an absurd result.**

Finally, the Kanaheles protest that the Commission's interpretation of CARD would preclude the Commission from ever reclassifying land after a county or the Department has made a decision concerning such land.  The LUC Order has no such consequence.

Given that the Kanaheles did not ask the Commission to reclassify the Astronomy Precinct, the Commission did not conclude that it was precluded from ever reclassifying the Astronomy Precinct.  Rather, the crux of the Commission's decision was that it lacked authority to prohibit land uses within conservation districts.  The Commission thereby determined that it lacked jurisdiction to exercise its declaratory ruling authority.

**4.    The Commission correctly interpreted <u>Mauna Kea I</u> and <u>Mauna Kea II</u>.**

The Kanaheles also argue that the "LUC incorrectly interpreted <u>Mauna Kea I</u> and <u>Mauna Kea II</u>" by concluding:

> The Hawaiʻi Supreme Court has considered and ruled on permitting and jurisdictional issues regarding <u>Mauna Kea in</u> [sic] <u>Mauna Kea Anaina Hou v. Bd. Of Land & Nat. Res.</u>, 136 Hawaii 376, 363 P.3d 224 (2015) and <u>Matter of Conservation District Use Application HA-3568 for the Thirty Meter Telescope</u>, 143 Hawaii 379, 431 P.3d 752 (2018).

According to the Kanaheles, the Commission's conclusion was erroneous because "[n]either <u>Mauna Kea I</u> nor <u>Mauna Kea II</u> passed

on the matter of the LUC's jurisdiction to classify or reclassify lands within the conservation district."

However, the Commission's conclusion did not claim that either Mauna Kea I or Mauna Kea II passed on the Commission's jurisdiction.  The LUC Order simply stated that "[t]he Hawaiʻi Supreme Court has considered and ruled on permitting and jurisdiction issues regarding Mauna Kea[.]"  The Commission therefore did not misinterpret Mauna Kea I or Mauna Kea II.  Rather, the Kanaheles misread the LUC Order.

## IV.  CONCLUSION

This court's role is to interpret the statutory scheme as enacted by the legislature.  The dissent contends this opinion "eliminat[ed] . . . the Commission's jurisdiction over conservation land bearing CDUPs granted by the Department."  Not so.  This court has faithfully interpreted the relevant statutes and concluded the statutory scheme does not permit the Commission to enforce uses within a conservation district.  This court did not, and indeed has no authority to, rewrite an existing statute.  Rather, "[o]ur function is to interpret the statute [or statutory scheme] as it exists, not to indulge in judicial legislation in the guise of statutory construction." Territory of Hawaii v. Shinohara, 42 Haw. 29, 34 (Haw. Terr. 1957).  While the dissent appears to question the efficacy of

45

the statutory scheme to protect conservation district land, it is the legislature's role, not ours, to amend existing law.  See McIntosh v. Murphy, 52 Haw. 29, 39 469 P.2d 177, 182 (1970) (Kobayashi, J., dissenting); Yates v. United States, 574 U.S. 528, 570 (2015) (Kagan, J., dissenting) ("If judges disagree with Congress's choice, we are perfectly entitled to say so — in lectures, in law review articles, and even in dicta.  But we are not entitled to replace the statute Congress enacted with an alternative of our own design.").

For the foregoing reasons, the Kanaheles' points of error lack merit, and the LUC Order is affirmed.

| | |
|---|---|
| Lance D. Collins and Bianca Isaki for Appellants | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Miranda C. Steed (Patricia Ohara and Lori N. Tanigawa on the brief) for Appellee Land Use Commission, State of Hawaiʻi | /s/ Lisa W. Cataldo |
| Jesse K. Souki and Joseph F. Kotowski, III, (Gary Y. Takeuchi also on the brief) for Intervenor-Appellee University of Hawaiʻi | |
| Ross T. Shinyama and J. Douglas Ing (Brian Kang and Summer H. Kaiawe also on the brief) for Intervenor-Appellee TMT International Observatory LLC | |

