***** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER *****

**Electronically Filed
Supreme Court
SCOT-24-0000498
28-AUG-2025
11:49 AM
Dkt. 32 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

HONOIPU HIDEAWAY, LLC,
Appellant-Appellant,

vs.

STATE OF HAWAIʻI, LAND USE COMMISSION,
Appellee-Appellee.

SCOT-24-0000498

APPEAL FROM THE LAND USE COMMISSION
(CASE NO. 3CCV-22-0000088; AGENCY DOCKET NO. DR21-73)

AUGUST 28, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.    INTRODUCTION

This case concerns the correction of an alleged error in a conservation district boundary map on Hawaiʻi Island. Appellant Honoipu Hideaway, LLC (Honoipu) seeks to use district boundary interpretation under Hawaiʻi Administrative Rules (HAR) § 15-15-22 (eff. 2019) to correct an alleged error in the location of the conservation district boundary on the 1974 Land

1

Use District Boundaries map. The Land Use Commission (LUC) denied Honoipu's petition, rejecting Honoipu's suggested interpretation of the district boundary. Honoipu appealed the LUC's Order Denying Petition for Declaratory Order, arguing, inter alia, the LUC imposed an incorrect burden of proof for its findings of fact. We hold that, absent rulemaking to the contrary, the proper burden of proof is the preponderance of the evidence standard. Because we conclude the LUC applied a heightened burden of proof, we vacate and remand to the LUC.

## II. BACKGROUND

Honoipu purchased 17.547 acres of littoral property in Kapaa-Upolu, North Kohala, Island and County of Hawai'i, for $905,000 in 2018. According to the State Land Use District Boundaries Map H-3 (Māhukona), dated 1974, the property consists of approximately 4.794 acres within the conservation district and 12.228 acres within the agricultural district.[1] The petition contends that the district boundary between the conservation district and the agricultural district on Honoipu's property follows the location of an old dirt road, rather than a newer road that had been built makai of the original road in 1961, prior to the drawing of the first LUC map in 1964. Had the LUC

---

[1] Because 0.525 acres of the total 5.319 acres of Honoipu's parcel that falls within the conservation district was identified as an erosion area in 2021, this petition only involves the remaining 4.794 acres within the conservation district.

map followed the makai location of the new road as of 1961,
1.813 acres of land currently within the conservation district
would have fallen within the agricultural district.  Honoipu
believes the LUC relied on outdated maps showing the incorrect
location of the road to draw the LUC map.

Honoipu petitioned the LUC for a declaratory order
requesting that the LUC "determine" the conservation district
boundary along the mauka edge of the road as it actually existed
in 1974, which Honoipu contended was consistent with the LUC's
intent.  Relying on the 1969 State of Hawaiʻi Land Use Districts
and Regulations Review, Honoipu argued that the LUC intended to
follow the new road and erred in maintaining the district
boundary where the old road had been located.[2]

---

[2]     The State of Hawaiʻi Land Use Districts and Regulations Review
report, prepared by Eckno, Dean, Austin & Williams to document the
recommendations and actions in the 1969 Five-Year Boundary Review, provides
in relevant part:

> Four major conditions have been recognized and recommendations
> based upon these conditions have been made for the new
> Conservation District boundaries.
>
> 1.  Where a plantation road, farm road, access way or public road
> exists at the edge of the agricultural use within reasonable
> proximity to the shoreline, it was used as the boundary between
> the Agriculture and Conservation Districts.
>
> 2.  Where a vegetation line such as a windbreak or row of trees
> more clearly marks the edge of the agricultural practice, this
> was used.
>
> 3.  In cases where the shoreline is bounded by steep cliffs or a
> pali, the top of the ridge was used.
>
> 4.  Where no readily identifiable physical boundary such as any
> of the above could be determined, a line 300 feet inland of the
> line of wave action was used.

(. . . continued)

In response, the LUC staff issued a report acknowledging that the road had been moved makai of its original location, but explained that the old road roughly corresponded to a 300-foot setback from the coastline and concluded that the LUC "likely" retained the 300-foot setback to avoid a costly and unnecessary redrawing of the district boundaries. Thus, LUC staff concluded that the LUC map was properly drawn as intended.

A public hearing was held,[3] at which Honoipu's attorney gave a presentation in support of its petition and at which one of Honoipu's managing members who resides on the property, Nathan Eggen, gave sworn testimony. During the presentation, Honoipu's attorney offered cartographic and photographic evidence to suggest that the conservation district boundary on the property was erroneously drawn in its present location and was instead properly located following the new road. Following the presentation, Eggen testified to his motivation for seeking a boundary interpretation, explaining that because the residences on the property are located in the conservation district and subject to special management area, "it's just a

---

(continued . . .)
Eckbo, Dean, Austin & Williams, State of Hawai'i Land Use Districts and Regulations Review 86 (1969) (emphasis added).

[3] No oral testimony from the general public was given.

4

very burdensome process for just living and using my home"
because many simple tasks require advance government approval.[4]

The Office of Planning and Sustainable Development
(OPSD) opposed Honoipu's petition for a declaratory order, both
in a December 13, 2021 statement of position and at the
December 22, 2021 hearing.  At the hearing, OPSD opposed the
petition on the basis that it did not "find sufficient reason to
believe that the current official boundary is incorrect or that
petitioner's alternate interpretation is instead the correct
one."  The County of Hawai'i also appeared at the hearing but
took no position, stating, "It's the county's belief that a
determination regarding changes to state land use boundaries is
the jurisdiction of the LUC and not the county."

Following the hearing, the LUC voted unanimously to
deny Honoipu's petition.  One of the LUC Commissioners,

---

[4]     Eggen described the burdens imposed by the current district
boundary location:

> You know, [the conservation district boundary] makes it
> hard to do things as simply as landscaping or planting
> trees.  You know, installing an irrigation system, trying
> to get solar panels, you know, to reduce my energy costs.
> Things like repaving my driveway.  All those things, you
> know, they can be done in conservation but they take, you
> know, a significant amount of extra procedure.  Some of
> them take years to go through the process.  Require, you
> know, lots of permits and approvals. . . .  It's not about
> that being, you know, good or bad but it's just a very
> burdensome process for just living and using my home.  And
> I think that correcting this issue would really simplify
> our lives.

Commissioner Giovanni, explained his rationale supporting the motion to deny Honoipu's petition:

> You know, for me, I have a very high bar when it comes to the LUC making a change of a district boundary from conservation to agriculture or other. And I always look to a [district boundary amendment] as being the proper course of action. In this case, they're looking for a simple declaratory ruling that would remedy the situation from the perspective of the landowner. I get it. I understand it. It is a simpler course of action. But for me, the case would have to be overwhelmingly compelling because I have such a high bar when it comes to conservation land. I think that [Honoipu's attorney] put forth a reasonable explanation. I think that it would be possible to put forward contrary reasonable explanations and I think the [OPSD] has done that to some extent. I really believe that this matter would be -- if the landowner is so inclined to pursue it, would be better and more appropriately addressed by the LUC in a [district boundary amendment]. I know that's more complicated, more expensive, but that's the risk you take when you buy conservation land. I will be supporting the motion.

(Emphasis added.)

In its Order Denying Petition for Declaratory Order, filed February 28, 2022, the LUC specifically found that Honoipu failed to present conclusive evidence of a mapping error:

> 44. The Commission did not find that Petitioner's evidence was conclusive that the [new] Road was intended to be used as a mapping landmark in the manner described by Petitioner.
>
> 45. The Commission did not find that Petitioner's evidence was conclusive that a mistake had been made in the 1969 LUC Map or that the mistake was similarly carried through to the 1974 LUC Map.
>
> . . . .
>
> 47. Petitioner's assertion that the [new] road was the edge of the agricultural use on the Property was not supported by the evidence as the Agricultural Uses map was not of sufficient detail to determine whether that assertion is correct.
>
> 48. The existence of the Coast Guard Loran station mauka of the road since 1944 is inconsistent with Petitioner's characterization of the road as the demarcation of the edge

6

> of agriculture as there is no indication that agriculture was practiced in connection with the Coast Guard station.
>
> 49.   There were no records of the Coast Guard or any other party disputing the Conservation district boundary line prior to the filing of this declaratory ruling request.

(Emphasis added) (record citations omitted).

As such, the LUC made the following relevant conclusions of law:

> 12.   The Commission did not find any compelling evidence that the LUC maps demarcation lines were improperly drawn.
>
> 13.   Based on the information provided by Petitioner and the presentation and arguments of the parties during the proceedings, the Commission concluded that:
>
>> a.   The Conservation district line was placed in the correct location on the State Land Use District Boundaries Map H-3, dated 1974 ("1974 LUC map").
>>
>> b.   The boundary interpretation that Commission staff provided to Petitioner on October 19, 2020, was correct.
>>
>> c.   There was no error in the map used by the Commission to draw the original State Land Use Conservation district lines and [sic]
>
> The Commission Staff accurately determined the location of the Conservation district line in its boundary interpretation.

(Emphasis added.)

Honoipu timely appealed the LUC's order to the Circuit Court for the Third Circuit and, pursuant to our recent decision in Honoipu Hideaway, LLC v. Land Use Commission, 154 Hawai'i 372, 550 P.3d 1230 (2024), the appeal was transferred nunc pro tunc to this court.

7

## III. STANDARD OF REVIEW

### A.    Agency Appeals

A court's review of administrative agency decisions is governed by HRS § 91-14(g) (Supp. 2016), which provides:

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1)    In violation of constitutional or statutory provisions;
>
> (2)    In excess of the statutory authority or jurisdiction of the agency;
>
> (3)    Made upon unlawful procedure;
>
> (4)    Affected by other error of law;
>
> (5)    Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6)    Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)."  Rosehill v. Land Use Comm'n, 155 Hawai'i 41, 50, 556 P.3d 387, 396 (2024) (quoting In re Kanahele, 152 Hawai'i 501, 510, 526 P.3d 478, 487 (2023)).

8

### B. Statutory Interpretation

"The interpretation of a statute is a question of law which this court reviews de novo." Kanahele, 152 Hawai'i at 509, 526 P.3d at 486 (quoting Keep the N. Shore Country v. Bd. of Land & Nat. Res., 150 Hawai'i 486, 50[3], 506 P.3d 150[, 167] (2022)).

In reviewing questions of statutory interpretation, we are guided by the following principles:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

State v. Castillon, 144 Hawai'i 406, 411, 443 P.3d 98, 103 (2019) (quoting Panado v. Bd. of Trs., Emps.' Ret. Sys., 134 Hawai'i 1, 1[1], 332 P.3d 144, 15[4] (2014)).

Rosehill, 155 Hawai'i at 49, 556 P.3d at 395.

### C. Interpretation of Administrative Rules

The general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.

Citizens Against Reckless Dev. v. Zoning Bd. of Appeals of the City and Cnty. of Honolulu, 114 Hawai'i 184, 194, 159 P.3d 143, 153 (2007) (citations omitted).

### IV.   DISCUSSION

On appeal, Honoipu presents three points of error, challenging: (1) the LUC's application of a heightened burden of proof for its factual findings; (2) the LUC's findings of fact ¶¶ 44, 45, 47, 48, and 49; and (3) the LUC's conclusions of law ¶¶ 12 and 13, as well as its denial of the petition.  We first address the appropriate burden of proof, which is dispositive.

**A.   District Boundary Interpretation is Only Proper Where the Location of a District Boundary is Uncertain**

As an initial matter, Honoipu's petition for declaratory order does not seek a district boundary amendment. Amendment of a conservation district boundary must satisfy the rigorous procedural and substantive safeguards mandated by HRS § 205-4(h) (2017),[5] including proof by "clear preponderance of the evidence that the proposed boundary is reasonable . . . and consistent with the polices and criteria established pursuant to sections 205-16 and 205-17."  HRS § 205-16 (2017) provides "No amendment to any land use district boundary nor any other action by the land use commission shall be adopted unless such amendment or other action conforms to the Hawaiʻi state plan." HRS § 205-17 (2017) requires the commission to consider, inter

---

[5]     "District boundary amendments involving lands in the conservation district, land areas greater than fifteen acres, or lands delineated as important agricultural lands shall be processed by the land use commission pursuant to [HRS] section 205-4."  HRS § 205-3.1(a) (2017) (emphasis added).

alia, the "impact of the proposed reclassification" on the "[p]reservation or maintenance of important natural systems or habitats" and "[m]aintenance of valued cultural, historical, or natural resources."  HRS § 205-17(3).  HAR § 15-15-50 (eff. 2019), effectuating HRS §§ 205-4 and -17, requires, inter alia, "an approved environmental impact statement or finding of no significant impact" and a "written disclosure and analysis addressing Hawaiian customary and traditional rights under [a]rticle XII, section 7 of the Hawai'i State Constitution."  HAR § 15-15-50(b), (c)(21).

Instead, Honoipu's petition for a declaratory order requested that the LUC interpret the district boundaries on its property under HAR § 15-15-22[6] and "determine" the location of

---

[6]     HAR § 15-15-22, "Interpretation of district boundaries," provides in relevant part:

> (b)     All requests for boundary interpretations shall be in writing and include the tax map key identification of the property and a print of a map of the property. . . .
>
> (c)     The executive officer may request the following information:
>
>   (1)     Additional copies of the print, including a reproducible master map of the print or an electronic copy in a recognized format of the executive officer's designation; and
>
>   (2)     Additional information such as, but not limited to, tax map key maps, topographic maps, aerial photographs, certified shoreline surveys, and subdivision maps relating to the boundary interpretation.

(. . . continued)

the conservation district boundary along the existing road rather than its current location on the LUC map. That is to say, Honoipu believes the district boundary as depicted on the LUC map was unintended and in error, thus uncertainty exists. HAR § 15-15-22, which was promulgated under the LUC's general authority to promulgate rules under HRS §§ 205-1 (2017) and -7

---

(continued . . .)

> The executive officer may employ, or require that the party requesting the boundary interpretation employ, at its sole expense, a registered professional land surveyor to prepare a map for interpretation.
>
> (d)   The executive officer may use all applicable commission records in determining district boundaries.
>
> (e)   The following shall apply whenever uncertainty exists with respect to the boundaries of the various districts:
>
> > (1)   Whenever a district line falls within or abuts a street, alley, canal, navigable or non-navigable stream or river, it may be deemed to be in the midpoint of the foregoing. If the actual location of the street, alley, canal, navigable or non-navigable stream or river varies slightly from the location as shown on the district map, then the actual location shall be controlling;
> >
> > (2)   Whenever a district line is shown as being located within a specific distance from a street line or other fixed physical feature, or from an ownership line, this distance shall be controlling; and
> >
> > (3)   Unless otherwise indicated, the district lines shall be determined by the use of the scale contained on the map.
>
> (f)   Whenever subsections (a), (b), (c), (d), or (e) cannot resolve an uncertainty concerning the location of any district line, the commission, upon written application or upon its own motion, shall determine the location of those district lines.

(Emphasis added.)

12

(2017),[7] permits limited review by the LUC to "resolve an uncertainty concerning the location of any district line" and "determine the location of those district lines,". HAR § 15-15-22(f). Thus, district boundary interpretation under HAR § 15-15-22 functions to resolve uncertainties about the spatial relationship between the LUC map and the land the map represents. See, e.g., HAR § 15-15-22(e). The LUC has interpreted uncertainty to include clear mapping errors.[8] See Rosehill, 155 Hawai'i at 58, 556 P.3d at 404 ("If the statute was silent or ambiguous as to the question at hand, the court would defer to the administrative agency's reasonable interpretation of the statute."). Absent uncertainty, district boundary interpretation is not the appropriate vehicle to change a district boundary; recourse must instead be made to the district

---

[7] HRS § 205-1, which establishes the LUC, provides in relevant part that "[the LUC] shall adopt rules guiding its conduct." HRS § 205-7, which governs the adopting, amendment, and repeal of its rules, provides "The [LUC] shall adopt, amend or repeal rules relating to matters within its jurisdiction in the manner prescribed in chapter 91."

[8] The LUC has granted petitions for declaratory orders brought pursuant to HAR § 15-15-22 where it found the LUC map manifestly differed from its stated intent. See In re Stengle, Docket No. DR99-21 (Mar. 24, 1999), as amended (Mar. 25, 1999) (ordering the LUC map be amended to reflect a district boundary along the top ridge of the pali as intended by its drafters); In re Harold K.L. Castle Found., Docket No. DR96-19 (Nov. 25, 1996) (ordering the LUC map be amended to include the entire property in the urban district based on existing urban improvement on property consistent with legislative intent); and In re City and Cnty. of Honolulu, Docket No. DR99-22 (Nov. 9, 1999) (ordering the LUC map be amended to reflect a district boundary following an actively used road as intended by its drafters).

boundary amendment procedures required by law.  HAR § 15-15-22;

HRS §§ 205-3.1, -4.

## B.    The Appropriate Burden of Proof is Preponderance of the Evidence

First, Honoipu argues that the LUC erred in applying a

heightened burden of proof in its findings of fact.  Honoipu

points to the LUC's express findings that the evidence proffered

by Honoipu was neither "conclusive" nor "compelling" as to the

LUC map drafter's intent or the presence of a mapping error.

Instead, Honoipu contends that the burden of proof for findings

of fact before the LUC should be the preponderance of the

evidence standard in the absence of any rulemaking to the

contrary.  The State variously asserts that the LUC did not err

because either no burden of proof applied or because the LUC

properly applied the preponderance of the evidence standard when

making its findings.  What burden of proof, if any, applies to

the LUC's findings of fact in a declaratory order appears to be

a question of first impression.

The State argues that because the LUC's review under

HAR § 15-15-22 is a limited review of its own records and not a

necessary evidentiary hearing, no burden of proof applies to its

factual findings.  The State is wrong.

### 1. HAR § 15-15-59 imposes some burden of proof on the party initiating an LUC proceeding

District boundary interpretations are petitions for declaratory orders brought pursuant to HRS § 91-8 and HAR subchapter 14, §§ 15-15-98 to -104.1.  When resolving a petition for declaratory order, the LUC may either grant or deny the petition without a hearing,[9] or set the petition for a hearing.  HAR §§ 15-15-100 (eff. 2019) (providing that the LUC must either grant, deny, or set a hearing for a petition for declaratory order within 90 days of its submission).  Whether the LUC holds a hearing on a petition for declaratory order, including for district boundary interpretation petitions, is at the LUC's discretion.  HAR § 15-15-103 ("The commission may, but shall not be required to, conduct a hearing on a petition for declaratory order.").  Thus, because a boundary interpretation hearing is not "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing," it is not a contested case for purposes of the Hawai'i Administrative Procedure Act (HAPA).  HRS § 91-1 (defining contested case); Kanahele, 152 Hawai'i at 511, 526 P.3d at 488 (quoting Lingle v. Haw. Gov't. Emps. Ass'n AFSCME, Local 152, AFL-CIO, 107 Hawai'i

---

[9]    The LUC may also "dismiss a petition for declaratory order that fails in material respect to comply with the requirements of this subchapter."

15

178, 184, 111 P.3d 587, 593 (2005) ("[D]iscretionary hearings are not contested cases because they are not required by law.")). Therefore, the preponderance of the evidence standard required by HRS § 91-10 would not apply.[10] However, that does not mean that <u>no</u> burden of proof would apply.

Instead, HAR § 15-15-100 provides that when the LUC "[s]et[s] the petition for hearing before the commission," "[t]he procedures set forth in subchapter 7 shall be applicable." HAR § 15-15-100(a)(e). Subchapter 7, HAR §§ 15-15-51 to -76, which governs LUC hearings, in turn provides that "the party initiating the proceeding shall have the burden of proof, including the burden of producing evidence and the burden of persuasion." HAR § 15-15-59(a) (eff. 2019). While subchapter 7 does not define the requisite burden of proof, HAR § 15-15-59 makes clear that in proceedings before the LUC,[11]

---

[10] HRS § 91-10, "Rules of evidence; official notice," provides in relevant part: "In contested cases: . . . (5) [e]xcept as otherwise provided by law, the party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The degree or quantum of proof shall be a preponderance of the evidence."

[11] HAR § 15-15-03 (eff. 2019) defines a "proceeding" for the purposes of chapter 15 of the HAR:

> "Proceeding" means any matter brought before the commission over which the commission has jurisdiction and shall include, but not be limited to:
>
> (1) Petitions for district boundary amendment;
>
> (2) Petitions for special permit;

(. . . continued)

including district boundary interpretation, some burden of proof applies.

Requiring a burden of proof is consistent with our precedent and the HAPA, which permits judicial review of agency decisions. Like other final agency decisions and orders, orders disposing of petitions for declaratory orders are subject to judicial review under HRS § 91-14(g). Lingle, 107 Hawai'i at 186, 111 P.3d at 595 ("[W]e hold that orders disposing of petitions for declaratory rulings under HRS § 91-8 are appealable . . . pursuant to HRS § 91-14."). As relevant here, HRS § 91-14(g) provides the LUC's findings of fact in a declaratory order will be affirmed unless they are "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record." See HRS § 91-14(g)(5); Rosehill, 155 Hawai'i at 50, 556 P.3d at 96 (quoting In re Kanahele, 152 Hawai'i at 510, 526 P.3d at 487).

---

(continued . . .)

(3)     Proceedings for the adoption, amendment, or repeal of rules under sections 91-3 and 205-7, HRS;

(4)     Petitions for declaratory orders under section 91-8, HRS;

(5)     An investigation or review instituted or requested to be initiated by the commission; and

(6)     All other matters in the administration of chapter 205, HRS.

Absent a burden of proof, judicial review of district boundary interpretation orders would be impossible. If we were to accept as true the State's argument that no burden of proof applies, judicial review of the LUC's findings of fact in a declaratory order would be thwarted because, without a burden of proof to weigh the evidence against, the court could not determine whether the agency's findings were clearly erroneous. In effect, any evidence, no matter how slight, and any inference made therefrom would be sufficient to defeat effective and meaningful review. Such a result would be contrary to our precedent and the legislature's manifest intent to permit judicial review of agency decisions.[12]

2.   **The LUC's findings of fact must apply the preponderance of the evidence standard absent rulemaking to the contrary**

Because we conclude that some burden of proof must apply, we now turn to what standard is required. Honoipu argues that the preponderance of the evidence standard is the lowest standard and that nothing in the LUC's three sources of authority - the HAPA, HRS §§ 91-1, et seq.; the Commission's enabling statutes, HRS §§ 205-1, et seq.; and the Commission's

_____

[12]   In 2016, the legislature acted to give this court direct review of the LUC's final decisions. See HRS § 205-19 (2017) (allowing appeals of final LUC decisions, including of contested cases, "directly to the supreme court for final decision"); see also id. § 91-8 (2017) ("Orders disposing of petitions [for declaratory order] . . . shall have the same status as other agency orders.").

own rules, HAR §§ 15-15-1, <u>et seq.</u> – requires or justifies the imposition of a higher "conclusive" or "compelling" standard. The State, in its briefing, does not expressly address this issue; instead, the State argues that should the preponderance standard apply, it was satisfied here.

"The purpose of fixing a particular standard of proof is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" <u>Masaki v. General Motors Corp.</u>, 71 Haw. 1, 13-14, 780 P.2d 566, 574 (1989) (quoting <u>In re Winship</u>, 397 U.S. 358, 370, (1970) (Harlan, J., concurring)). This court has explained that "[t]he law has evolved three standards of levels of proof for different types of cases": preponderance of the evidence, clear and convincing, or beyond a reasonable doubt. <u>Iddings v. Mee-Lee</u>, 82 Hawai'i 1, 13, 919 P.2d 263, 275 (1996) (quoting <u>Masaki</u>, 71 Haw. at 14, 780 P.2d at 574).

> In most civil proceedings, such as a case involving a monetary dispute between private parties, the plaintiff must show by a "preponderance of the evidence" that his or her claim is valid. Under the preponderance standard, the parties share the risks of an erroneous verdict in roughly equal fashion. The preponderance standard directs the factfinder to decide whether "the existence of the contested fact is more probable than its nonexistence." As one commentator points out, to prevail, "[a] plaintiff need only offer evidence sufficient to tip the scale slightly in his or her favor, and a defendant can succeed by merely keeping the scale evenly balanced."
>
> At the other end of the spectrum, in criminal proceedings, the government is required to prove its case "beyond a reasonable doubt." Society has judged that it is

19

> significantly worse for an innocent [person] to be found guilty of a crime than for a guilty [person] to go free. Therefore, as stated by the Supreme Court, "[w]here one party has at stake an interest of transcending value—as a criminal defendant his [or her] liberty—this margin of error is reduced as to him by the process of placing on the other party the burden . . . of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt."
>
> The level of proof between these two extremes is that of "clear and convincing" evidence. . . .
>
> . . . .
>
> Thus, "clear and convincing" evidence may be defined as an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases. It is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable.

Iddings, 82 Hawai'i at 13-14, 919 P.2d at 275-76 (quoting Masaki, 71 Haw. at 14, 780 P.2d at 574) (citations omitted) (brackets and ellipses in original).

Consistent with other jurisdictions across the country, we hold that absent a statute or court rule requiring a higher standard, administrative hearings are governed by a preponderance of the evidence standard. See 2 Am. Jur. 2d Administrative Law § 316 ("The general standard of proof for administrative hearings is by a preponderance of the evidence."); Steadman v. SEC, 450 U.S. 91, 102 n.22 (1981) ("[T]he APA ha[s] traditionally been held satisfied when the agency decided on the preponderance of the evidence."); Craven v. State Ethics Comm'n, 454 N.E.2d 471, 476 (Mass. 1983) ("Proof by a preponderance of the evidence is the standard generally

applicable to administrative proceedings."); Seherr-Thoss v. Teton Cnty. Bd. of Cnty. Comm'rs, 329 P.3d 936, 944 (Wyo. 2014) ("The normal standard of proof in administrative hearings is the preponderance-of-the-evidence standard."); In re Black Hills Power, Inc., 889 N.W.2d 631, 636 (S.D. 2016) ("[T]he burden of proof for administrative hearings is preponderance of the evidence.").

Adopting the preponderance of the evidence standard is also consistent with other recent LUC declaratory orders disposing of district boundary interpretation petitions brought under HAR § 15-15-22. E.g., In re Church, Docket No. DR21-72 (Mar. 15, 2022), recon. denied (applying preponderance of the evidence standard in a declaratory order denying boundary interpretation petition).

The LUC would be entirely within its power to engage in rulemaking to impose a higher burden of proof in petitions for declaratory orders generally, or for district boundary interpretation involving conservation lands specifically. HRS § 205-1(c) ("[The LUC] shall adopt rules guiding its conduct[.]"); see also id. § 91-8 ("Each agency shall adopt rules prescribing the form of the petitions [for declaratory orders] and the procedure for their submission, consideration, and prompt disposition."). However, no such rulemaking has occurred. Therefore, we hold that a petitioner's burden of

proof for district boundary interpretation is the preponderance

of the evidence.

### 3. The LUC erred when it applied a heightened burden of proof in its findings of fact

We now turn to whether, as asserted by the State, the

preponderance of the evidence standard was properly applied.  We

conclude on the record before us that it was not.  The LUC

expressly found that Honoipu failed to produce "conclusive"

evidence that a mistake had been made on the LUC map and that

the conservation district was intended to follow the location of

the new road:

> 44.  The Commission did not find that Petitioner's evidence was <u>conclusive</u> that the [new] Road was intended to be used as a mapping landmark in the manner described by Petitioner.
>
> 45.  The Commission did not find that Petitioner's evidence was <u>conclusive</u> that a mistake had been made in the 1969 LUC Map or that the mistake was similarly carried through to the 1974 LUC Map.

(Emphasis added.)

Similarly, at the hearing, Commissioner Giovanni

explained that he believed something more than the preponderance

of the evidence standard applied:

> You know, for me, I have <u>a very high bar</u> when it comes to the LUC making a change of a district boundary from conservation to agriculture or other.  And I always look to a [district boundary amendment] as being the proper course of action.  In this case, they're looking for a simple declaratory ruling that would remedy the situation from the perspective of the landowner.  I get it.  I understand it. It is a simpler course of action.  But for me, the case would have to be <u>overwhelmingly compelling because I have such a high bar</u> when it comes to conservation land.  I think that Mr. Chipchase put forth a reasonable explanation.  I think that it would be possible to put

22

> forward contrary reasonable explanations and I think the [Office of Planning and Sustainable Development] has done that to some extent. I really believe that this matter would be -- if the landowner is so inclined to pursue it, would be better and more appropriately addressed by the LUC in a [district boundary amendment]. I know that's more complicated, more expensive, but that's the risk you take when you buy conservation land.

Ultimately, the LUC concluded along the same lines, stating in its conclusion of law ¶ 12 that "[t]he Commission did not find any compelling evidence that the LUC maps [sic] demarcation lines were improperly drawn." (Emphasis added.) Taken together, these indicia support a conclusion that the LUC erroneously applied a heightened burden of proof when it denied Honoipu's petition for declaratory order. See HRS § 91-14(g)(4); Citizens Against Reckless Dev., 114 Hawai'i at 193, 159 P.3d at 152.

However, as this court has noted, "the Administrative Procedures Act . . . precludes judicial reversal or modification of an administrative decision even where affected by error of law . . . unless substantial rights of the petitioner may have been prejudiced." Paul v. Dep't of Transp., 115 Hawai'i 416, 431, 168 P.3d 546, 561 (2007) (quoting Survivors of Medeiros v. Maui Land & Pineapple Co., 66 Haw. 290, 293, 660 P.2d 1316, 1319 (1983)); HRS § 91-14(g) (providing that a reviewing court "may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced"). Because we cannot say Honoipu's substantial rights were not prejudiced

by the error, we conclude the LUC committed reversible error when it applied a heightened burden of proof in its findings of fact.  See HRS § 91-14(g).  We vacate and remand the case to the LUC to make new findings of fact and conclusions of law, applying the preponderance of the evidence standard, consistent with this opinion.

**C.    We Decline to Reach Honoipu's Other Challenges to the LUC's Findings of Fact and Conclusions of Law**

Next, Honoipu challenges specific findings of fact and conclusions of law made by the LUC in its order denying its district boundary interpretation petition.  In the absence of findings applying the appropriate burden of proof, we decline to weigh in on the merits of Honoipu's petition; instead, in keeping with our precedent, "we defer to those agencies with the na‘auao (knowledge/wisdom) on particular subject matters to get complex issues right.  ‘Ku‘ia ka hele a ka na‘au ha‘aha‘a (hesitant walks the humble hearted).'"  Rosehill, 155 Hawai‘i at 59, 556 P.3d at 405 (quoting City & Cnty. of Honolulu v. Sunoco LP, 153 Hawai‘i 326, 363, 537 P.3d 1173, 1210 (2023) (Eddins, J., concurring)).

**V.    CONCLUSION**

For the foregoing reasons, we vacate the LUC's Order Denying Petition for Declaratory Order, filed February 28, 2022, denying Honoipu's Petition for Declaratory Order for Boundary

24

Interpretation, filed June 25, 2021, and remand to the LUC for further proceedings consistent with this opinion.

| | |
|---|---|
| Calvert G. Chipchase and<br>Christopher T. Goodin<br>for appellant | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| Miranda C. Steed<br>for appellee | /s/ Todd W. Eddins |
| | /s/ Lisa M. Ginoza |
| | /s/ Vladimir P. Devens |